## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF NORTH DAKOTA

| | |
|---|---|
| In Re: Roger K. O'Neill | Bankruptcy No.: 14-30569 |
| Debtor, | Chapter 7 |
| Gene W. Doeling, Trustee, | |
| Plaintiff, | |
| vs. | Adversary No.: 15-07005 |
| Theresa C. O'Neill, | |
| Defendant. | |

## MEMORANDUM AND ORDER

**I.    INTRODUCTION**

Chapter 7 Trustee Gene W. Doeling filed an adversary complaint seeking to avoid prepetition transfers from Debtor Roger K. O'Neill to Defendant Theresa C. O'Neill.  Specifically, the Trustee asserts Debtor's real estate transfers to Defendant pursuant to their divorce Settlement Agreement were preferential and fraudulent under 11 U.S.C. §§ 547 and 548(a)(1).  Defendant denies the allegations.

This adversary action is a core proceeding under 28 U.S.C. § 157(b)(2)(H).  The Court has jurisdiction in this matter under 28 U.S.C. §§ 1334 and 157.  This opinion constitutes findings of fact and conclusions of law in accordance with Federal Rule of Bankruptcy Procedure 7052.

## II.    FACTS

Debtor and Defendant married on June 28, 1985.  In 1988, they purchased a house in Mandan, North Dakota, for $25,000.  Defendant's parents gave the couple $5,000, which they used for a down payment on the house.  To finance the remaining balance, Defendant and Debtor signed a promissory note for $20,750 and granted a mortgage to Gate City Federal Savings Bank on October 20, 1988.  Defendant paid this debt in full in 2004.  All five of the couple's children were raised in this home, and Defendant continues to live there.  The house has not been updated since Debtor and Defendant purchased it in 1988.  It is in need of significant repairs, including new insulation, roofing, windows and siding, totaling approximately $45,000 to $50,000 in renovation expenses.  According to Defendant, who obtained an estimate, it will cost $14,000 to repair the roof alone.  A 2014 Morton County Real Estate Tax Statement shows the tax-assessed value of the house was $102,500 in 2012, $135,000 in 2013 and $139,800 in 2014.

Debtor worked as a truck driver from 1991 to fall 2011 or spring 2012.  In 1994, he opened his own trucking business, Roger O'Neill Trucking.  Debtor travelled a great deal, sometimes for months at a time.  During their marriage, Defendant worked as a registered nurse and assumed nearly all of the household duties and parenting responsibilities for their five children.  Debtor rarely contributed to the day-to-day maintenance of the home or the parenting of the children.  When he was home, Debtor described himself as one who "drank like a pig and fought like an animal," reflective of his sentiment that he "never grew up."

Defendant earned wages and benefits through her job as a registered nurse.  She handled all the family finances and paid all credit card and home expense bills.

2

She also managed Debtor's personal finances and helped him manage his business, including finances, taxes and operations.  Defendant claimed he was not capable of managing his finances on his own.  Debtor paid her no consideration for her services to his business.

While married, Debtor and Defendant kept separate bank accounts.  Debtor initially opened a personal checking account at Gate City Bank that was also in Defendant's name.  With Defendant's help, Debtor eventually converted the account to a business account for Roger O'Neill Trucking.  Debtor did not remove Defendant's name from the account after he converted it to a business account.  She had access to Debtor's account even after the couple separated.  Gate City Bank stopped sending statements to Defendant roughly a year before they divorced.  Debtor deposited all his trucking and personal income into his Gate City Bank account and withdrew money from the account with a debit card for his personal expenses and some of his business expenses.  Before they separated, Defendant paid Debtor's trucking expenses with funds from Debtor's bank account.  Defendant paid most of the household bills with funds from her bank account but paid some from Debtor's account.

Debtor and Defendant opened credit card accounts with Chase, Sears and Discover to pay for household and trucking expenses.  Although both of them used credit cards, they used the Chase and Sears cards for Debtor's business expenses, including diesel fuel and repairs when he hauled goods.  Neither Defendant nor Debtor used the Discover card often.  Defendant used it when she visited her daughter once or twice a year, and Debtor used it only for diesel fuel on a few occasions.

3

To consolidate their numerous monthly payments (including credit card debt), the purchase of a new truck for Debtor's business and ongoing diesel fuel costs, Defendant and Debtor borrowed $106,400 on December 8, 2006, and granted a mortgage on their home. Debtor did not contribute any payments to this debt; rather, Defendant made every payment with funds from her account since the origination of the loan.

Debtor inherited assets on two occasions during the marriage. After Debtor's brother died in 2007, Debtor received $30,000 in cash which was deposited into Debtor's bank account. Defendant did not use Debtor's inheritance for personal expenses; Debtor spent all or most of the money. The loss of his brother was traumatic for Debtor. Debtor testified that he squandered this inheritance—he simply "drank it all up," spending up to $1,000 a day on drinking and gambling. Defendant testified that she noticed Debtor's car at the bar three to four times a week after his brother's death.

Debtor also received an inheritance from his aunt's estate in 2008, consisting of $120,000 in cash and 330 acres of pastureland in Morton County, North Dakota. Again, the money was deposited into Debtor's bank account, and Defendant did not use any of this inheritance for her personal expenses. Debtor lost about half of the money "in the stock market" and "drank [] up" the rest. The land "became tied up" in a lawsuit between Debtor, his brother Kevin and his cousin Linda Gerhardt. After the lawsuit, the pastureland was divided. Linda and George Gerhardt received 80 acres and Debtor and his brother received 250 acres in undivided interests.[1] The Gerhardts conveyed

---

[1] Paragraph 9B of the parties' divorce Settlement Agreement provides, however: "Roger O'Neill owns [the pastureland] in common with Kevin O'Neill and John O'Neill as personal representative of the Allen O'Neill Estate." According to the deed, the Gerhardts granted 250 acres to Debtor and Kevin O'Neill. The Court also received testimony from

250 acres of pastureland to Debtor and his brother on March 12, 2012.  After this conveyance, he owned the following parcel of real estate as tenants in common with Kevin O'Neill ("pastureland"):

> Township 135, Range 79
> Section 7:  SE1/4, S1/2 NE1/4
> Section 8:  SW1/4, S1/2 NW1/4, S1/2 SE1/4
>                 And W1/2 NW1/4 SE1/4

This pastureland is a parcel surrounded by other parcels owned by Debtor's family.  The soil consists of gumbo and rock.  Two reservoirs are the only source of water for livestock.  Debtor did not know what the pastureland is worth, but suggested that it was not worth much because it could only sustain six cow/calf pairs.  He has never received any rental payments from the pastureland and claimed that the O'Neills' neighbors would probably not buy the property if it was offered for sale.

The Trustee hired an appraiser to estimate the retroactive value of the land as of November 13, 2013.  The appraiser assessed the value of the pastureland in 2013 based on a 580-acre parcel of land previously owned in whole by the O'Neill family that included the parcel Debtor inherited.  She concluded that the value of the 580-acre parcel in 2013 was $642,000 or $1,106.90 per acre.  Next, she subtracted the value of 330 acres in which Debtor did not have an interest and estimated that the 250 acres owned by Debtor and his brother was worth $276,724.14.  She divided this figure by two and concluded that Debtor's undivided one-half interest was worth $138,362.07 on November 13, 2013.

_____

Debtor and Defendant confirming that only Debtor and Kevin O'Neill owned the pastureland.  Therefore, the Settlement Agreement appears inaccurate.

In reaching this conclusion, she considered five land sales in Morton County from 2012 to 2013, where the buyer paid between $550 and $1,650 per acre.  The description of the purported comparable sales included land types, accessibility, water source and location different from the parcel Debtor inherited, raising questions about whether the parcels were genuinely comparable.

Further, the appraiser did not analyze the specific 250 acres in which Debtor held an interest and did not estimate the value based on characteristics unique to this parcel. She acknowledged that the parcel at issue is surrounded by land owned by the O'Neill family and that a third-party buyer would have to erect a fence to use the parcel as pastureland.  She observed several other deficiencies including a developing prairie dog town and leafy spurge growth.  She offered no testimony disputing Debtor's characterization of the land as gumbo.  Rather than evaluating these factors and adjusting her estimated value accordingly, she simply testified that she did not know the value of the 250 acres at issue.

In challenging the credibility of the appraisal, Defendant offered a North Dakota Department of Trust Lands March 2013 publication, "2013 County Rents and Values North Dakota."  That publication listed the per-acre value for "2013 Non-Irrigated Pastureland," similar to Debtor's pastureland in Morton County between $625 and $699 per acre.  The publication also shows eight counties in which the average per-acre value is between $1,000 and $1,763, but all of these counties are east of Morton County and many of them are located in the Red River Valley, far from Morton County.

Additionally, the appraiser retained by the Trustee did not apply a discount to the value of Debtor's undivided one-half interest in the property.  She acknowledged that a

partial interest in land can be less valuable than a fee simple interest but testified that partial interests are difficult to appraise.  Rather than analyzing the issue, it is her practice to allow the parties to reach a discounted price on their own through negotiations.  Consequently, she determined the value of Debtor's interest by calculating the full value of the 580 acres, subtracting the value of 330 acres to reflect the portion Debtor did not own and dividing the value of the remaining 250 acres by two.

Debtor and Defendant dispute the appraiser's estimate.  Both maintain the property has nominal value.

Debtor's drinking increased after his brother's death in 2007, and this impacted his family life.  He spent more time at the bar and began "messing around."  Defendant continued to maintain the family home and care for the children.  According to Debtor and Defendant, this situation had a negative effect on the marriage and eventually drove Debtor and Defendant apart, resulting in their separation.

At Defendant's request, Debtor moved out of the family home and into a motel in August 2009.  He lived in a motel for several months and then moved in with his girlfriend.  Debtor and Defendant have not lived together since that time.  At the time of their separation, two of their children were minors and still living at home.  Defendant assumed custody and cared for them.

Debtor and Defendant no longer supported each other financially after they separated.  Debtor began managing most of his personal and business finances while at the motel.  Defendant continued to pay Debtor's health insurance costs because her employer's insurance policy automatically included her spouse.  Defendant also paid Debtor's vehicle insurance costs until Debtor bought a Ford F150 in 2011.

Debtor stopped using their joint credit cards when he moved out.  At the time of separation, the total amount of credit card debt was approximately $28,000, with around $10,000 on the Discover card and $18,000 combined for the Chase and Sears cards. Defendant made all the credit card payments after their separation.

Debtor moved in with his girlfriend sometime after Christmas 2009.  Debtor's girlfriend began handling Debtor's personal finances after he moved to her home. Debtor did not remove Defendant's name from his bank account at this time, however. Defendant testified that she received statements for Debtor's bank account until sometime around the fall of 2012.

Despite the separation, Debtor and Defendant continued to file joint income tax returns until 2012.  Defendant explained that they continued to file jointly because they were still married.  They individually delivered the necessary documents to their accountant, who prepared the return.  Their tax returns show Debtor's trucking business generated $129,203 in 2009, $54,108 in 2010 and $2,802[2] in 2012.  The Court received no tax information for 2011.  The tax returns also show total depreciation for Debtor's trucking business as $8,877 in 2009, $4,438 in 2010 and $2,720 in 2012.  Debtor and Defendant did not file jointly in 2013 or subsequent years.

From December 2009 to their divorce in 2013, the two remained separated and maintained limited contact.  Although Defendant appeared frustrated with Debtor's behavior and inability to "grow up," she allowed him to visit the house because he was the children's father.  He visited the children occasionally.  Debtor and Defendant talked

---

[2] Debtor testified that the 2012 business income was probably from the sale of trucking equipment.  Debtor recalled that he received $26,000 from the sale of his trailer and $30,000 from the sale of his truck, both of which were encumbered by liens.

once or twice a month, usually about the children.  Their conversations were cordial.

When asked why she did not file for divorce earlier, she explained that she wanted him

"to finish what he started" by "messing around."  Defendant recalled explicitly telling him

this when he came to the house for their children's graduation parties in 2010 and 2013.

During this time, Debtor's health began to deteriorate.  His excessive drinking

caused liver damage and a buildup of internal fluids, requiring multiple paracentesis

procedures.  His toe began to blacken and lose feeling, which Debtor attempted to treat

with antibiotics.  Debtor arrived at his son's graduation party with a walker and had

difficulty ambulating, and Defendant noticed Debtor's health problems during his

periodic visits to her home.  His condition worsened to the point where he could no

longer operate a truck, forcing him to stop trucking sometime in late 2011 or early 2012,

except for driving a few loads for his brother during harvest.  According to Debtor's

bankruptcy schedules, 2011 was the final year of his business.

Debtor could not remember what trucking equipment he owned beyond a truck

and a trailer or when he sold the equipment.  Defendant recalled that Debtor owned a

semi, flatbed trailer and hopper at the time of separation.  Debtor guessed that he sold

the truck and trailer in 2013, prior to the divorce.[3]  Defendant assumed the sale was

after the divorce because Debtor asked a friend to help him sell it after he left the

hospital in October 2013, but she admitted she had not seen the truck or trailer since

the separation and did not know where they were.  Defendant testified that the trucking

---

[3] Debtor explained at trial that he had a poor memory, especially around the time
of his hospitalization because he was in and out of consciousness and had a fever of 108
degrees that caused memory loss.

assets were listed on their joint 2012 tax return.  The divorce Settlement Agreement signed in October 2013 contained no reference to the semi, flatbed trailer or hopper.

On July 12, 2013, Debtor collapsed as a result of a leg infection and was admitted to Sanford Health for treatment.  Defendant found out about Debtor's hospitalization through telephone calls from Debtor's girlfriend and from the social worker at the hospital.  The social worker urged Defendant to visit the hospital and make medical decisions about Debtor's care because she was Debtor's spouse and owner of his health insurance policy.  Debtor was not lucid at the time and could not comprehend his choices or make medical decisions.

Defendant knew Debtor's prognosis was not good.  Debtor's condition was so severe that it brought him near death on several occasions.  His doctors advised Defendant to put him on comfort care, but Defendant asked the doctors to examine Debtor's leg and ultimately decided to grant permission to have it amputated it to save his life.  After the amputation, Debtor remained at Sanford until his transfer to Vibra Healthcare in Mandan on August 12, 2013.  Debtor remained at Vibra for six weeks, from August 12 to October 1, 2013.

During Debtor's hospitalization, Defendant visited him once or twice a week. Sometimes her purpose was simply to see Debtor, which was often the case when she visited Debtor with her children, and sometimes she went to visit with the doctor or to provide Debtor's father access to the room.

The decision to amputate Debtor's leg was extremely difficult for Defendant.  She testified that making this life-and-death decision was too much for her, and she no longer wanted that kind of responsibility.  This prompted her to seek a divorce.

Defendant retained attorney Alex Kelsch to initiate divorce proceedings.[4]  Debtor

wanted her to move forward with the divorce while he was in the hospital because he

was not sure he would survive his illness and wanted to straighten out his affairs.

Kelsch drafted a divorce Settlement Agreement after meeting with Defendant

who told him about the couple's assets.  Defendant took the divorce paperwork to

Debtor at his request, and he signed the Settlement Agreement on October 1, 2013, the

same day he was released from Vibra.  Defendant signed the Settlement Agreement on

October 1, 2013 as well.  Although Debtor did not read the document, Defendant

testified that she read the entire document to him.  Debtor testified he felt no need to

have representation because he wanted Defendant to have everything "out of fairness."

The Settlement Agreement provided that Defendant was awarded the house and

pastureland, subject to any outstanding mortgages.[5]  There was no outstanding debt

against the pastureland, and the 2006 debt secured by a mortgage against the house

had been reduced to approximately $99,000 at the time of the divorce.  Defendant also

received all her personal clothing and effects, a 2006 Pontiac Torrent, a 2003 Victory

motorcycle,[6] the funds in her bank account and her life insurance policy, if any.  Debtor

received his personal clothing and effects, his guns, a 2011 Ford F150, the funds in his

---

[4] The law firm that employs Kelsch previously represented Debtor in the land
dispute with his cousin.

[5] Debtor always considered the house Defendant's because she was the mother
in the family.  Similarly, Defendant testified that after the separation she asked Debtor if
they should sell the house and he replied, "no, it's yours."

[6] Although the Settlement Agreement provided that Defendant received the Victory
motorcycle, the motorcycle remained in Debtor's possession at his girlfriend's house
where Debtor resided.  After Debtor pestered her for the title, Defendant eventually gave
it to Debtor.  Debtor then sold the motorcycle to his friend and used the $5,000 in proceeds
to hire a bankruptcy attorney.

bank account and his life insurance policy, if any.  Debtor testified at trial that he

probably had around $3,000 in his bank account at the time of the divorce.  Debtor does

not remember the sale price of his Ford F150, but he recalled he owed about $13,000 in

secured debt when he sold it around the time of the divorce.  The Kia Optima that

Debtor purchased was also encumbered by a lien.  Debtor owned three guns at the

time: a shotgun, a rifle and a pistol, worth a total of approximately $500 to $600.

Defendant assumed the debt secured by their home and their credit card debt.

Defendant paid the Sears and Chase credit card debt prior to the divorce.  The unpaid

balance on the Discover credit card totaled between $4,600 and $6,000.

At trial, Debtor testified that, because he thought he would soon die as a result of

his injuries, he explicitly requested the Settlement Agreement include a transfer of his

real estate interests to Defendant to prevent any possibility of his children fighting over

his assets when he died.  During his deposition, Debtor testified he wanted the

pastureland to go to his children and that he wanted the land to stay in the family.

Debtor also testified that he wanted Defendant to "have everything," in part,

because he could not provide ongoing support.  The Settlement Agreement provided for

no alimony or child support.  Their children had all reached the age of majority at the

time of the divorce.

Additionally, Debtor maintained that he wanted Defendant to have everything

because she had been responsible while he never settled down or contributed

significantly to their joint obligations.  Debtor elaborated that Defendant was a great

parent who took care of their family needs while he, on the other hand, was unhelpful

and was not around much for the children, except to discipline them.  Debtor also

indicated that he respected his father's wishes by giving Defendant everything because of Debtor's conduct during the marriage.

Likewise, Defendant testified that the division of property was based on the history of their marriage and was fair because she "was the responsible one through the whole marriage."  Kelsch testified that he thought the agreement was fair based on each party's responsibilities and contribution during the relationship.

The divorce complaint is dated October 1, 2013.  Defendant filed a motion for default judgment pursuant to the Settlement Agreement (dated October 1, 2013), on October 2, 2013.  The district court dated its Findings of Fact, Conclusions of Law and Order for Judgment on October 9, 2013, and its divorce judgment on October 10, 2013.

Kelsch prepared two quit claim deeds transferring Debtor's interests in the home and pastureland to Defendant and brought them to Debtor's home where Debtor signed them on November 13, 2013.  Kelsch described what the deeds contained, and Debtor signed them without reading them and gave them to Kelsch.  The deed transferring Debtor's interest in the home was recorded on November 22, 2013.  The deed transferring his interest in the pastureland was recorded on December 16, 2013.

Debtor was not employed and had no source of income when he was admitted to the hospital.  After his transfer to Vibra, Vibra employees helped Debtor apply for social security benefits.  He was awarded social security benefits and began receiving $1,100 per month.  Defendant knew Debtor had begun receiving social security benefits and had no other income.  She testified that she had no knowledge of his other obligations.

Defendant understood Debtor's treatment would result in significant medical expense because of the nature of his illness and the necessary medical procedures, but

13

also believed Debtor was covered under Defendant's health insurance policy through the entire treatment.  Both Debtor and Defendant believed Defendant's health insurance would cover all of his hospital expenses.  Defendant assumed he would be covered because she had already paid the policy deductible through appointments for their children.[7]  Debtor testified that someone with Sanford told him that his health insurance would cover all his expenses.  It was only after the divorce that Debtor realized that insurance did not cover all his medical costs, and that he was still liable for the debt and would have to pay Sanford.  Defendant testified at trial that she was not sure how Debtor could pay the medical bills if his insurance did not cover the costs because his only income was social security.  Nevertheless, she indicated that Debtor would be able to pay any costs incurred through the sale of his truck and trailer, which she believed he still owned upon entering the hospital.

Debtor stated Defendant "deserved" the house and he "didn't even think of [his creditors]" when making the transfers to Defendant.  He adamantly maintained that he never intended to "hinder," "delay" or "defraud" creditors in making these transfers. When asked if he was concerned with whether his creditors could pursue a judgment that could attach to his house or pastureland, Debtor stated, "I don't worry about that . . . No, never even thought about it."

Defendant never suspected any fraudulent intention in the transfers and never heard Debtor indicate a fraudulent purpose in conveying the land.  Rather, Debtor

---

[7] At her deposition, Defendant testified that she read the insurance statements sent to her house that listed the charges, but she did not think these were statements of patient liability.  She also testified that Debtor was covered by her insurance until December 31, 2013, and assumed his expenses, including the amputation, would be paid.

repeatedly expressed that it was his intent to convey the pastureland to Defendant,
hoping it would ultimately go to his children.  Although he recognized that Defendant
had full ownership of the property and could convey it to anyone she wanted, he was
confident Defendant would "do the right thing,"—ensure that their children would
eventually get the property.  They had no agreement requiring Defendant to transfer the
property to the children.  Debtor never explicitly stated his purpose to Defendant, but
Defendant understood this to be Debtor's purpose.  Defendant stated that she intends
to give the pastureland to the children in a will that she will eventually draft and execute.

Debtor filed for relief under Chapter 7 of the Bankruptcy Code on October 28,
2014.  Debtor stated he needed to file the petition because his health insurance policy
did not cover costs of his hospitalization as anticipated.  Debtor did not disclose the
transfer of his interest in the family home or pastureland in his Statement of Financial
Affairs.  His amended schedules show he owned $27,631.86 in assets and owed
$111,727.60 in liabilities.  Specifically, Debtor owed $8,023 in unsecured priority debt to
the IRS, which he testified was forgiven.[8]  He also owed $84,517.40 in unsecured
nonpriority claims: $76,679.40 to medical providers, $6,239 to Discover Financial
Services (a debt that Defendant assumed in the divorce) and $1,599 to other general
unsecured creditors.  During his deposition, the Trustee asked if $84,517.40 was about
the same amount that he owed at the time of the divorce.  Debtor's answer was not
entirely responsive.  He stated that he called medical providers, who told him not to

---

[8] It is unclear when the IRS debt arose, when Debtor and the IRS communicated
about the debt or when it was forgiven.  Debtor claims he wrote the IRS requesting debt
forgiveness before the divorce, but the debt is listed on his petition filed almost a year
after the divorce.

worry about his debt because the debt would be "taken care of." Debtor did not agree

or disagree that the entire sum of medical debt was due and owing at the time of his

divorce. At trial, the Trustee reminded Debtor of his deposition testimony and asked

Debtor if he owed debt to medical providers at the time of the divorce. Consistent with

his deposition testimony, Debtor testified at trial that he thought insurance benefits had

satisfied or would satisfy his medical debts and denied transferring his interest in

pastureland and the house to avoid paying these debts. He conceded that he owed

medical debt arising from the amputation at the time of the divorce, but repeated again

that he did not expect to have to pay any of this debt. He did not think he would have

any bills, except his car payment identified earlier in his testimony.

## III.    LEGAL ANALYSIS

The Trustee seeks to avoid Debtor's transfers of his interests in the marital home

and pastureland to Defendant under 11 U.S.C. § 548(a)(1), alleging that Debtor made

the transfers with actual and constructive intent to hinder, delay or defraud his

creditors.[9] The Trustee also seeks to avoid the transfers as preferential transfers to an

insider under 11 U.S.C. § 547(b).

### A.    Fraudulent Transfer under 11 U.S.C. § 548(a)(1)

Bankruptcy Code section 548(a)(1) provides:

(a)(1) The trustee may avoid any transfer . . . of an interest of the debtor in
property, or any obligation . . . incurred by the debtor, that was made or
incurred on or within 2 years before the date of the filing of the petition, if
the debtor voluntarily or involuntarily—

> (A) made such transfer or incurred such obligation with actual intent
> to hinder, delay, or defraud any entity to which the debtor was or

---

[9] The Trustee does not seek to avoid other transfers made pursuant to the
settlement agreement, such as the transfer of title to a motorcycle.

became, on or after the date that such transfer was made or such obligation was incurred, indebted; or

(B)(i) received less than a reasonably equivalent value in exchange for such transfer or obligation; and

(ii)(I) was insolvent on the date that such transfer was made or such obligation was incurred, or became insolvent as a result of such transfer or obligation[.]

11 U.S.C. § 548(a)(1).  To avoid transfers under section 548, the Trustee must show either that the transfer was made with actual fraudulent intent or that the transfer was constructively fraudulent.  BFP v. Resolution Trust Corp., 511 U.S. 531, 535 (1994). Under both actual and constructive fraud theories, the party alleging the fraud bears the burden of proof by a preponderance of the evidence.  Luker v. Eubanks (In re Eubanks), 444 B.R. 415, 422 (Bankr. E.D. Ark. 2010) (citations omitted); see also Kaler v. Craig (In re Craig), 144 F.3d 587, 590 (8th Cir. 1998).

### 1.    Actual Fraud under 11 U.S.C. § 548(a)(1)(A)

The Trustee must prove the following elements to succeed on his section 548(a)(1)(A) fraudulent transfer claim: (1) the debtor had an interest in property, (2) the debtor voluntarily or involuntarily transferred that interest, (3) the transfer occurred on or within two years before debtor filed for bankruptcy relief, (4) the debtor made the transfer with actual intent to hinder, delay or defraud any creditor of the debtor on or after the date of the transfer.  11 U.S.C. § 548(a)(1); see also Kaler v. McLaren (In re McLaren), 236 B.R. 882, 898 (Bankr. D.N.D. 1999); Allred v. Hauser (In re Jundt), No. ADV 13-1011, 2014 WL 2742868, at *6 (Bankr. D.S.D. June 17, 2014).  Actual harm to creditors is not an element.  Brown v. Third Nat'l Bank (In re Sherman), 67 F.3d 1348, 1355, n.6 (8th Cir. 1995) (citation omitted).

17

The Trustee met his burden of proving the first three elements of his section 548(a)(1)(A) claim. Debtor voluntarily signed quit claim deeds transferring his interest in both properties on November 13, 2013.[10] He petitioned for bankruptcy relief under Chapter 7 on October 28, 2014, less than one year after executing the quit claim deeds. Therefore, the Trustee satisfied these elements.

The last element of the Trustee's section 548(a)(1)(A) cause of action is fraudulent intent. The Trustee argues that Debtor and Defendant colluded to make the property transfers with intent to hinder, delay or defraud Debtor's creditors. He argues that Debtor's testimony that he expected to die and wanted his children to receive the pastureland and Defendant to receive the home direct evidence of his intent to defraud his creditors. The Trustee suggests that transferring the property to Defendant in the Settlement Agreement accomplished these objectives. The Court is not convinced.

The Trustee offered evidence that Debtor may have been indebted to the IRS, Discover Financial Services, medical service providers and two general unsecured creditors (whom he owed less than $1,000 each) on the date Debtor transferred the marital home and pastureland to Defendant. The record shows that, on the date of petition, Debtor owed $8,023 in unsecured priority debt to the IRS, which he testified was forgiven. It is unclear when the IRS debt arose, when Debtor and the IRS communicated about the debt or when the IRS forgave the debt. Debtor claims he wrote the IRS requesting debt forgiveness before the divorce, but the debt is listed on

---

[10] The quit claim deed transferring Debtor's interest in the house was recorded on November 22, 2013. The quit claim deed transferring Debtor's interest in the pastureland was recorded on December 16, 2013. Thus, Debtor conveyed his interest in both properties within one year of petitioning for bankruptcy relief.

his petition filed almost a year after the divorce.  Without more information and context, the Court finds that this evidence is not sufficient to find, by a preponderance of the evidence, that Debtor transferred his interests in the real estate with intent to hinder, delay or defraud the IRS.

Debtor also owed $84,517.40 in unsecured nonpriority claims: $76,679.40 to medical providers, $6,239 to Discover Financial Services (a debt that Defendant assumed in the divorce) and $1,599 to other general unsecured creditors.  During his deposition, the Trustee asked Debtor if $84,517.40 was about the same amount as Debtor owed at the time of the divorce.  Debtor's answer is not entirely responsive.  He stated that he called his medical providers who told him not to worry about his debt because the debt would be "taken care of."  Debtor did not agree or disagree that the entire sum of medical debt was due and owing at the time of his divorce or that he owed a total of $84,517.40 to unsecured creditors.  At trial, the Trustee reminded Debtor of his deposition testimony and asked Debtor if he owed debt to medical providers at the time of the divorce.  Consistent with his deposition testimony, Debtor testified at trial that he thought insurance proceeds had satisfied or would satisfy his medical debts and denied transferring his interest in pastureland and the house to avoid paying these debts.  In a confusing exchange with the Trustee at trial, Debtor conceded that he owed medical debt arising from his amputation at the time of the divorce, but repeated again that he did not expect to have to pay any of this debt.  He did not think he would have any bills, except his car payment identified earlier in his testimony.

While it is apparent that most of the medical services provided to Debtor were provided before he signed the Settlement Agreement on October 1, 2013, the Court

19

received no invoices from medical service providers as evidence, and it is not clear whether Debtor was billed for these services before October 2013, whether the insurance carrier had processed the bills or whether the debt was due and owing at the time of the divorce settlement. The only consistent evidence—which the Court finds credible—is Debtor's testimony that he thought insurance would cover all of his medical bills at the time he signed the divorce settlement. He also repeatedly testified that he had not used credit cards since 2009 and did not think he owed any debt except car payments when he signed the Settlement Agreement.

Debtor also offered explanations (in addition to his desire that the pastureland stay in the family) for transferring his real property interests to Defendant, including his behavior during their marriage and his inability to provide spousal support. Debtor maintained that Defendant paid most of the household expenses and mortgage payments with her salary, she helped him manage his business and cared for their children. Debtor claims Defendant deserves the property she received in the divorce settlement and acknowledged that she has the right to sell the property interests he transferred rather than bequeathing the pastureland to their children. Debtor denied intent to hinder, delay or defraud any creditors in transferring these assets to Defendant.

While ensuring that the pastureland remained in the O'Neill family was among the reasons Debtor transferred his interest in real property to Defendant, the Trustee did not prove that this reason was a primary motivator or that the purpose of these transfers was to preclude heath care providers or other creditors from liquidating the property.[11]

---

[11] In any case, the intent to prefer one creditor over another is not necessarily equivalent to actual intent to hinder, delay, or defraud. See Armstrong v. United Bank of Bismarck (In re Bob's Sea Ray Boats, Inc.), 144 B.R. 451, 458 (Bankr. D.N.D. 1992)

Further, the Court finds no evidence of collusion between Debtor and Defendant.  The

Trustee did not argue, and the facts do not show, that the divorce was a sham.

Accordingly, the Court finds that Debtor's admissions that he wanted the pastureland to

"go to his children" and "stay in the family," are not sufficient to establish direct evidence

of his fraudulent intent to defraud his creditors.

The Trustee also argues that he offered circumstantial evidence of actual intent

to defraud creditors sufficient to create a presumption of fraud.  Because direct

evidence of actual intent to hinder, delay or defraud creditors is rare, courts may infer

fraudulent intent from the circumstances surrounding the transfer.  Richie Capital

Mgmt., LLC v. Stoebner, 779 F.3d 857, 861 (8th Cir. 2015) (quoting In re Sherman, 67

F.3d at 1353).  The Eighth Circuit Court of Appeals considers factors or "badges of

fraud" to determine whether a Debtor transferred assets with actual intent to hinder,

delay or defraud creditors.  Id.  The badges of fraud include:

> (1) lack or inadequacy of consideration; (2) family, friendship or other close
> relationship between the transferor and transferee;  (3) retention of
> possession, benefit or use of the property in question; (4) financial condition
> of the transferor prior to and after the transaction; (5) conveyance of all of
> the debtor's property; (6) secrecy of the conveyance; (7) existence of trust
> or trust relationship; (8) existence or cumulative effect of pattern or series
> of transactions or course of conduct after the pendency or threat of suit; (9)
> instrument affecting the transfer suspiciously states it is bona fide; (10)

---

(citation omitted).  "[A] transfer that prefers a particular creditor or which places property beyond the reach of other creditors may be merely the result of stupidity or ignorance as opposed to a calculated intent to defraud."  Id.; see also Rubin v. Mfgrs Hanover Trust Co., 661 F.2d 979, 988–89 (2nd Cir.1981) ("When an overburdened debtor perceives that he will soon become insolvent, he will often engage in a flurry of transactions in which he transfers his remaining property, either outright or as security, in exchange for consideration that is significantly less valuable than what he transferred. Although such uneconomical transactions are sometimes merely final acts of recklessness, the calculating debtor may employ them as a means of preferring certain creditors or of placing his assets in friendly hands where he can reach them but his creditors cannot.").

debtor makes voluntary gift to family member; and (11) general chronology of events and transactions under inquiry.

Kaler v. Huynh (In re Huynh), 392 B.R. 802, 810 (Bankr. D.N.D. 2008) (citation omitted); see also Kelly v. Armstrong, 141 F.3d 799, 802 (8th Cir. 1998).  The badges of fraud are a nonexhaustive list of "circumstantial factors" that a court may use to infer fraudulent intent, and courts are "free to consider any other factors bearing upon the issue of fraudulent intent."  Ritchie Capital Mgmt., LLC, 779 F.3d at 861–62 (quoting Jensen v. Dietz (In re Sholdan), 217 F.3d 1006, 1009–10 (8th Cir. 2000)).

The presence of a single badge is typically not sufficient to establish actual fraudulent intent.  In re Sherman, 67 F.3d at 1354.  The confluence of several badges, however, creates a presumption of fraudulent intent.  Ritchie Capital Mgmt., LLC, 779 F.3d at 861–62; Kelly, 141 F.3d at 802.  Once the trustee offers evidence sufficient to create a presumption of fraudulent intent, "'the burden shifts to the transferee to prove some legitimate supervening purpose for the transfers at issue.'"  Ritchie Capital Mgmt., LLC, 779 F.3d at 861–62 (quoting Kelly, 141 F.3d at 802).  For example, a transferee could show a legitimate supervening purpose by establishing that she accepted the transfer in good faith for value.  Id.  Absent significantly clear evidence of a legitimate supervening purpose, the confluence of several badges of fraud can conclusively establish actual fraudulent intent.  In re Sherman, 67 F.3d at 1354 (citation omitted)).

The Trustee points to the badges of fraud provided under North Dakota law and maintains that he offered evidence sufficient to establish several of them.  While this Court typically applies the badges of fraud analysis adopted under federal common law, the Eighth Circuit in Richie Capital Management, LLC recently found that the Minnesota Bankruptcy Court did not err in concluding that the trustee was entitled to a presumption

of actual fraudulent intent after applying badges of fraud under Minnesota law.  Ritchie

Capital Mgmt., LLC, 779 F.3d at 862–63.  The Eighth Circuit noted "[c]ourts may

consider any factors they deem relevant to the issue of fraudulent intent."  Ritchie

Capital Mgmt., LLC, 779 F.3d at 863.

The Trustee offered evidence that Debtor transferred all of his nonexempt assets

with significant value to Defendant.  Debtor conceded that his income derived solely

from social security disability benefits and that his only assets were his personal

clothing and effects, guns, funds in his bank account (approximately $3,000 at the time

of the divorce), and a Ford truck—most of which were exempt to the extent they had

equity.  The Trustee also offered evidence that Debtor transferred his interests in real

estate shortly after he received medical treatment that ultimately resulted in a large

debt.  He also argued that Debtor transferred his interests in real estate to an "insider."

While the Court declines to find that Defendant is an "insider" as that term is used in a

section 547 analysis, it recognizes that several circumstances in this case raise

suspicion regarding whether Debtor and Defendant share a close relationship.  Debtor

and Defendant were married for 28 years, Defendant was the primary caretaker for their

five children, she assisted him with his business at least until they separated, she

allowed him to benefit from her health insurance policy and she made the medical

decisions necessary to save Debtor's life.  In light of all the circumstances, the Court

finds that the Trustee established a presumption of fraud.

Once the Trustee establishes a presumption of fraud, the burden shifts to

Defendant to prove some legitimate supervening purpose for the transfers.  Ritchie

Capital Mgmt., LLC, 779 F.3d at 862.  "The burden which shifts is not a burden of going

forward with the evidence requiring the bankrupt to explain away natural inferences, but a burden of proving that he has not committed the objectionable acts with which he has been charged."  Kelly, 141 F.3d at 802 (citation and internal quotations omitted).

Defendant points out that she received the real property transfers pursuant to the Settlement Agreement that was incorporated into the North Dakota state court's Findings of Fact, Conclusions of Law and Order for Judgment, as well as the divorce Judgment.  She maintains that the property division in the divorce judgment was fair and equitable.  She also asserts that she accepted the transfers in good faith and for value, an affirmative defense under section 548(c).

In Ritchie Capital Mgmt., LLC, the Eighth Circuit discussed the section 548(c) defense as a legitimate supervening purpose for a fraudulent transfer.  779 F.3d at 861–62.  Whether framed as a legitimate supervening purpose or an affirmative defense under section 548(c), Defendant carries the burden of proving that her defense is sufficient to overcome the presumption of fraud.  Id.; In re Petters Co., Inc., 499 B.R. 342, 360–61 (Bankr. D. Minn. 2013).  To prove an affirmative defense under section 548(c), Defendant must show that she gave value in exchange for the transfer and accepted the transfers in good faith.  11 U.S.C. § 548(c); see Stoebner v. Ritchie Capital Mgmt., L.L.C. (In re Polaroid Corp.), 472 B.R. 22, 67 (Bankr. D. Minn. 2012); In re McLaren, 236 B.R. at 901–02.

The Bankruptcy Code does not define good faith.  Doeling v. Grueneich (In re Grueneich), 400 B.R. 688, 693 (B.A.P. 8th Cir. 2009) (citing In re Sherman, 67 F.3d at 1355).  Whether a transferee acted in good faith is a factual determination courts make on a case-by-case basis.  Id. (citation omitted).

> "To determine whether a transferee acts in good faith, courts look to what the transferee objectively knew or should have known instead of examining the transferee's actual knowledge from a subjective standpoint. In other words, a transferee does not act in good faith when he has sufficient knowledge to place him on inquiry notice of the debtor's possible insolvency."

Meeks v. Red River Entm't of Schreveport, (In re Armstrong), 285 F.3d 1092, 1096 (8th Cir. 2002) (quoting In re Sherman, 67 F.3d at 1355); see also In re Grueneich, 400 B.R. at 693 (citation omitted). A transferee's clear involvement in fraud can prevent the transferee from asserting certain defenses, including good faith. Sarachek v. Crown Heights House of Glatt, Inc. (In re Agriprocessors, Inc.), 521 B.R. 292, 302 (Bankr. N.D. Iowa 2015) (citations omitted).

Debtor signed the Settlement Agreement on the day he was released from Vibra. He signed the quit claim deeds transferring his interests in real property to Defendant 43 days later, as promised in the Settlement Agreement. Defendant knew Debtor had received numerous medical services that would have to be paid. However, Defendant assumed that medical insurance would cover these expenses. She testified that Debtor was covered under her medical insurance policy until December 31, 2013, roughly three months after he had received all or most of his treatment. She paid policy deductible expenses during the children's visits to health care providers, so she assumed Debtor would incur no expense for his treatment. Under the terms of the Settlement Agreement, Defendant assumed the couple's obligations to pay credit card debt and the debt against the marital home. Defendant knew of no other obligations or debts Debtor owed but thought he could pay any debt he owed by selling his truck and trailer, which she believed he still owned upon entering the hospital. Defendant also knew Debtor had applied for social security benefits and had no other income.

Viewing the facts from an objective perspective, the record shows Debtor was covered by Defendant's insurance, the deductible was paid and there was no reason to suspect Debtor would owe substantial medical debt at the time of the transfers.  While Debtor transferred his interests in real estate—which were the only nonexempt assets of significant value—he also transferred all his debt obligations except for his car payment.  The record shows Debtor has sufficient income from social security benefits to make the car payment.  Accordingly, the Court finds that, while Defendant knew Debtor's income and other assets were modest, she did not know or have reason to know that the transfer of real estate interests would make him insolvent.

Based on Debtor's and Defendant's responsibilities and contributions to the marriage, Defendant believed the Settlement Agreement was fair.  As noted above, the Court is not convinced that Debtor and Defendant conspired to transfer property to avoid paying Debtor's creditors.  The Trustee did not argue, and the facts do not show, that the divorce was a sham.  Accordingly, the Court finds Defendant accepted the transfer of Debtor's interests in real property in good faith.  See, e.g., MWI Veterinary Supply Co. v. Rodgers (In re Rodgers), 315 B.R. 522, 531 (Bankr. D.N.D. 2004) (finding a divorce agreement was entered in good faith despite the allegedly close relationship after the divorce and the shift of all the debt to the debtor and all the assets to his wife in the divorce agreement).

Having established good faith, Defendant must meet her burden of showing she gave value for the property interests Debtor transferred to her.  11 U.S.C. § 548(c). Section 548(d)(2)(A) defines "value" as "property, or satisfaction or securing of a present or antecedent debt of the debtor, but does not include an unperformed promise

26

to furnish support to the debto[.]"  11 U.S.C. §548(d)(2)(A).  In measuring value under section 548(c), some courts look to the reasonably equivalent value standard under section 548(a).[12]  Other courts opine that section 548(c) is measured from the transferee's perspective.[13]  In re Hannover Corp., the Fifth Circuit explained:

> Instead of inquiring into the possibility and extent of the debtor's loss, [section 548(c)] provides a means by which the unwitting trading partner can protect himself.  Received property can be retained 'to the extent' that the "transferee . . . gave value to the debtor."  The provision looks at value from the perspective of the transferee:  How much did the transferee "give"?  The concern here, quite properly, is for the transferee's side of the exchange, not the transferor's gain.

In re Hannover Corp., 310 F.3d at 802.  In other words, the Fifth Circuit "looks not to 'the transferor's gain,' but rather to the value that the transferee gave up as its side of the bargain."  Williams, 769 F.3d at 904.

---

[12] E.g., Slone v. Lassiter (In re Grove-Merritt), 406 B.R. 778, 810–811 (Bankr. S.D. Ohio 2009) (citations omitted) ("[T]o establish a defense to avoidability under § 548(c), a transferee must show both that the value provided to the Debtor was reasonably equivalent to the value transferred by the Debtor and that the transfer received from the debtor was received in good faith."); Stalnaker v. Gratton (In re Rosen Auto Leasing, Inc.), 346 B.R. 798, 806 (B.A.P. 8th Cir. 2006) ("To the extent Mr. Gratton did not give value for purposes of determining whether he gave value under 11 U.S.C. § 548(a)(1)(B), he likewise did not give value for purposes of asserting a defense under 11 U.S.C. § 548(c)." (citations omitted)); Dobin v. Hill (In re Hill), 342 B.R. 183, 203 (Bankr. D.N.J. 2006) ("While the Third Circuit has not yet defined 'value' in [section 548(c)] context, this court is persuaded that the standard should be reasonably equivalent value." (citation omitted); Satriale v. Key Bank USA, N.A. (In re Burry), 309 B.R. 130, 135 (Bankr. E.D. Pa. 2004) (citations omitted) (concluding that value in section 548(c) is reasonably equivalent value because "this makes sense given that the definition of value, the term reasonably equivalent value and the good faith defense requiring a tender of value all appear in the same Code section.").

[13] E.g., Williams v. FDIC (In re Positive Health Mgmt.), 769 F.3d 899, 904–06 (5th Cir. 2014) (citing Jimmy Swaggart Ministries v. Hayes (In re Hannover Corp.), 310 F.3d 796, 802 (5th Cir. 2002)) ("Williams"); Welt v. Publix Super Markets, Inc. (In re Phoenix Diversified Inv. Corp.), 08-15917-EPK, 2011 WL 2182881, at *4 (Bankr. S.D. Fla. June 2, 2011); Orlick v. Kozyak (In re Fin'l Federated Title & Trust, Inc.), 309 F.3d 1325, 1332 (11th Cir. 2002)).

In <u>Williams</u>, the Fifth Circuit approached the section 548(c) value analysis by applying the following methodology:  First, it determines whether a good faith transferee gave any value.  <u>Id.</u> at 906.  If the transferee gave value, it then determines whether the value it received exceeds the consideration it gave.  <u>Id.</u>  If so, it applies the "netting approach" by subtracting the difference and granting the trustee the right to recover the difference.  <u>Id.</u> at 909.  It ruled:

> The language of the Bankruptcy Code and policies it embodies therefore lead us to the following conclusion:  A good faith transferee is entitled to the protections of section 548(c) when it gives any value in return, but only to the extent of that value.  When a transferee receives a fraudulent transfer the value of which exceeds the consideration it gave up in return, section 548(c) requires netting.

<u>Id.</u> at 908–09; <u>see also</u> <u>Lindquist v. JNG Corp.</u> (<u>In re Lindell</u>), 334 B.R. 249, 256 (Bankr. D. Minn. 2005).

The Court finds the latter approach articulated in <u>Williams</u> properly distinguishes "value" under section 548(c) from "reasonably equivalent value" under section 548(a)(1)(B), giving meaning to both subsections.  This approach is consistent with the plain language of the two provisions.  "[W]hen the legislature uses certain language in one part of the statute and different language in another, the court assumes different meanings were intended."  <u>Sosa v. Alvarez-Marchain</u>, 542 U.S. 692, 711 n.9 (2004). The <u>Williams</u> approach also provides a genuine defense to a good faith transferee, even if the transferor did not provide reasonably equivalent value under section 548(a).  <u>See</u> <u>Williams</u>, 769 F.3d at 907 (citing 5 COLLIER ON BANKR. ¶ 548.09[5] (16th ed. 2014)).

Finally, by distinguishing reasonably equivalent value under section 548(a)(1)(B) from value under section 548(c), the Fifth Circuit recognized that consideration need not be "reasonably equivalent" to be valid.  <u>Williams</u>, 769 F.3d at 908 (citation omitted).  Any

value given by a transferee in return for a transfer is sufficient to meet the "value" element, but the good faith transferee is protected only to the extent of the value.  Id.; 11 U.S.C. § 548(c) ("a transferee or obligee . . . that takes for value and in good faith has a lien on or may retain any interest transferred . . . to the extent that such transferee or obligee gave value to the debtor in exchange for such transfer or obligation.") (emphasis added).  "And, because consideration may be disproportionately small, to hold that a transferee who merely gives 'good consideration' in exchange for a fraudulent transfer may keep the entire amount would allow it to benefit at the expense of the debtor's creditors based on the fortuity that it received a fraudulent transfer." Williams, 769 F.3d at 908 (footnote omitted).  The netting approach balances the interests of the transferee against the interests of creditors, advancing the policies of the Bankruptcy Code and giving effect to the specific language in section 548(c).

Defendant argues that she assumed Debtor's obligations to pay credit card debt and the debt secured by a mortgage on their home.  She also points to numerous sacrifices she made and financial obligations she assumed during their marriage, arguing the Court should consider all these circumstances in deciding whether she gave value.  Defendant's assumption of the obligation to pay the Discover credit card debt and the debt against the marital home in exchange for Debtor's transfer of real estate interests is sufficient to show value under section 548(c).[14]  11 U.S.C. § 548(d)(2)(A).

---

[14] Separate from the section 548(c) affirmative defense, the Court finds that the facts outlined above also support Defendant's claim that the division of property in the divorce proceedings is a legitimate supervening purpose for Debtor's transfer of the homestead and pastureland property to Defendant.

The next question is whether the value Defendant received exceeds the consideration she gave.  If so, the Court will apply "netting approach" by subtracting the difference and granting the Trustee the right to recover the difference.

Under the divorce Settlement Agreement, Defendant also received all her personal clothing and effects, a 2006 Pontiac Torrent, a 2003 Victory motorcycle (which Debtor sold and then spent the proceeds), the funds in her bank account and her life insurance policy, if any.  Debtor received his personal clothing and effects, three guns worth approximately $500 to $600, a 2011 Ford F150, approximately $3,000 in his bank account and life insurance policy, if any.  The parties focus their arguments on the value of real estate and debt obligations transferred.  Therefore, the Court assumes Defendant's personal clothing and effects, vehicle, motorcycle, bank account and insurance policies are equivalent in value to the personal effects, truck, guns and bank account Debtor received.

Pursuant to the Settlement Agreement, Debtor transferred his obligation to pay the debt against the marital home and his interest in the marital home.  The Court received very little information about the value of the home.  Defendant and Debtor paid $25,000 for the home in 1988.  The 2014 Morton County Real Estate Tax Statement shows the tax-assessed value of the house was $102,500 in 2012, $135,000 in 2013 and $139,800 in 2014.  Debtor and Defendant testified that the house needed significant repairs, including roof, siding, windows and insulation replacement.  Defendant estimated the cost of repairs to be between $45,000 and $50,000.  There is no evidence that the tax assessor considered the necessary repairs in determining tax-assessed value.  Assuming the home's value at the time of transfer in November 2013

corresponds to the 2013 tax-assessed value of $135,000, the home would be worth $85,000 to $90,000 after repairs.[15]  The debt that is secured by the mortgage against the home is higher than the home's value.  Defendant and Debtor borrowed $106,400 on December 8, 2006, and granted a mortgage against the home.  Defendant testified there was approximately $99,000 left to pay on the debt at the time of the divorce.  Consequently, the debt against the home was $9,000 to $14,000 more than its value.  Thus, Defendant assumed an obligation in excess of the value she received.

Defendant also assumed the couple's credit card debt.  Defendant paid the Sears and Chase credit card debt prior to the divorce.  Defendant recalled that the unpaid balance on the Discover credit card totaled between $4,600 and $6,000 at the time of the divorce.

In addition to transferring his interest in the marital home and debt against it, Debtor transferred his interest in pastureland to Defendant pursuant to the Settlement Agreement.[16]  The pastureland is a parcel surrounded by other parcels owned by Debtor's family.  The soil consists of gumbo and rock, and the only source of water for livestock are two reservoirs.  Debtor does not know what the pastureland is worth, but suggested that it was not worth much because it can only sustain six cow/calf pairs.  He

---

[15] See Boudreaux v. Holloway (In re Holloway), 09-30446, 2015 WL 1545376, at *9 (Bankr. S.D. Ga. Mar. 31, 2015) (citation omitted) (considering necessary repairs and market interest in reducing the tax assessor's value of property and concluding a tax assessor's value is often not the fair value of the property because "[t]here often is a lag in assessments and the county has an interest in maintaining its tax base, so it is not unusual for the actual fair value of property to be less than the tax assessor's value.").

[16] Under North Dakota law, inherited property, like property acquired before and during a marriage, may be considered in an equitable distribution analysis regardless of the source.  Schwarz v. Schwartz, 563 N.W.2d 391, 393 (N.D. 1997); Anderson v. Anderson, 390 N.W.2d 554, 555 (N.D. 1986).

has never received any rental payments from the pastureland and claimed that the O'Neills' neighbors would probably not buy the property if it was offered for sale.

The Trustee hired an appraiser to estimate the value of the land at the time of transfer. The appraiser assessed the value of the pastureland in 2013 based on a 580-acre parcel of land previously owned in whole by the O'Neill family that includes the parcel Debtor inherited. She concluded that the value of the 580-acre parcel in 2013 was $642,000 or $1,106.90 per acre. Next, she subtracted the value of 330 acres in which Debtor did not hold an interest and estimated that the 250 acres owned by Debtor and his brother was worth $276,724.14. She divided this figure by two and concluded that Debtor's undivided one-half interest was worth $138,362.07 at the time of the transfer to Defendant.

In reaching this conclusion, she considered five land sales in Morton County from 2012 to 2013 and gave greater weight to the higher sales. The description of the reportedly comparable sales included land type, accessibility, water source and location different from the parcel Debtor inherited, weighing against the credibility of her estimate because these parcels do not appear to be genuinely comparable to Debtor's land.

Further, the appraiser did not analyze the specific 250 acres in which Debtor held an interest and did not estimate the value based on characteristics unique to this parcel. She acknowledged that the parcel at issue is surrounded by land owned by the O'Neill family and that a third-party buyer would have to erect a fence to use the parcel as pastureland. She observed several other deficiencies including a developing prairie dog town and leafy spurge growth. She offered no testimony disputing Debtor's description of the land as gumbo. Rather than evaluating these factors and adjusting her estimated

32

value accordingly, she admitted she did not know the value of the 250 acres at issue. This testimony also weighs against the credibility of her estimate.

Defendant offered a North Dakota Department of Trust Lands March 2013 publication, "2013 County Rents and Values North Dakota."  The publication listed the per-acre value for "2013 Non-Irrigated Pastureland" in Morton County, similar to Debtor's pastureland as between $625 and $699 per acre.  The publication also shows eight counties in which the average per-acre value is between $1,000 and $1,763, but all of these counties are east of Morton County and many of them are located in the Red River Valley, far from Morton County.  This exhibit calls into question the appraiser's $1,106.90 per acre estimate.

Additionally, the appraiser retained by the Trustee did not apply a discount to the value of Debtor's undivided one-half interest in the property.  She acknowledged that a partial interest in land can be less valuable than fee simple ownership, but testified that partial interests are difficult to appraise.  Rather than analyzing the issue, it is her practice to allow the parties to reach a discounted price on their own through negotiations.  Consequently, she determined the value of Debtor's interest by calculating the full value of the 580 acres, subtracting the value of 330 acres to reflect the portion Debtor did not own and dividing the value of the remaining 250 acres by two, giving no discount for the difficulties in selling an undivided half interest.  The appraiser's decision to avoid this issue also weighs against the credibility of her estimate.  "It is generally accepted that a sale of the estate's undivided one-half interest would generate substantially less than a sale of property free of the owner's interest because of the chilling effect it has on prospective purchasers of the property."

33

Armstrong v. Trout (In re Trout), 146 B.R. 823, 829 (Bankr. D.N.D. 1992) (citing Bakst v. Griffin (In re Griffin), 123 B.R. 933, 936 (Bankr. S.D. Fla. 1991).[17]  The nature of Debtor's undivided one-half interest in the land diminishes its value because prospective buyers would take the property subject to another estate.  Id.  Additionally, Debtor, Defendant and the Trustee's appraiser agree that the pastureland is nestled into a larger tract of O'Neill land, requiring a third-party buyer to erect a fence to use the land for grazing.  Given all these factors, the Court finds that the value of the pastureland should be reduced due to the "chilling effect" on the marketability of a half interest nestled into a larger tract owned by the O'Neill family.

Debtor and Defendant dispute the appraiser's estimate.  Both testified about the property's deficiencies and maintain the property has little value.

Based on all the evidence, the Court rejects the testimony of the Trustee's appraiser and finds the most credible evidence of the pastureland value is the North Dakota Department of Trust Lands March 2013 publication.  This publication listed the per-acre value for "2013 Non-Irrigated Pastureland," in Morton County similar to Debtor's pastureland between $625 and $699 per acre.  Given the characteristics of the soil and accessibility and marketability issues unique to the parcel at issue, the Court

---

[17] Many cases that address the "chilling effect" of an undivided one-half interest on a parcel's value involve undivided interests in a residence where another owner will continue to reside on the property.  E.g., Manty v. Bougie (In re Bougie), 510 B.R. 606, 612–13 (Bankr. D. Minn. 2014) (citations omitted).  Other courts have indicated that the same rationale applies to nonresidential land.  See, e.g., Grochocinski v. Ziegler (In re Zeigler), 320 B.R. 362, 383 (Bankr. N.D. Ill. 2005) ("It is generally accepted that the sale of a bankruptcy estate's undivided interest will generate substantially less than the sale of the property free of each owner's interest . . ., especially when the co-owners can continue to live on the property.").

considers the lower price per acre to be the most persuasive estimate of its value.[18]

Accordingly, the Court finds that the value of the 250-acre parcel of pastureland is not

more than $156,250 ($625 x 250 acres).  Debtor's half interest in this land was worth

not more than $78,125 at the time of transfer in November 2013.  Splitting the property

value equally in this netting analysis under section 548(c), rather than relying on the

divorce Settlement Agreement that transferred a full half interest to Defendant,

Defendant is entitled to $39,062.50 (half of Debtor's interest in $78,125).

Splitting all the disputed assets and obligations equally, Defendant's share of the

assets and obligations are as follows:

+$39,062.50  Defendant's share of the half interest in pastureland.

-$7,000.00   Marital home ($135,000 tax-assessed value less repairs of
             -$50,000, based on the testimony regarding the extent and
             nature of the necessary repairs, less debt against home of
             $99,000 totals $14,000.  Splitting debt and property equally in
             this netting analysis, Defendant is entitled to credit for half of
             this sum.)

-$3,000.00   Credit card debt between $4,600 to $6,000
             (This assumes the higher end of the estimate based on
             Defendant's trial testimony.   Spitting the debt equally,
             Defendant is entitled to half this sum.)

$29,062.50   Total value of Defendant's share.

Under the terms of the divorce judgment, Defendant received $78,125 (Debtor's

interest in the pastureland) less $14,000 (sum by which the repairs and debt against the

marital home exceed its value) less $6,000 credit card debt for a total of $58,125.  She

---

[18] The 250-acre parcel may be worth even less than the $625 per acres based on
the deficiencies listed in the record.  However, the Court received no evidence regarding
the extent of the deficiencies or how to quantify them.

is entitled to half of this value.  Therefore, the value Defendant received which exceeds

the obligations she assumed is $29,062.50.

Defendant suggests the Court should consider the value she contributed to the

marriage in its analysis of good faith under section 548(a).  She argues that she

provided "concrete 'value' by working full time, raising the children, changing diapers,

cooking, cleaning, taking the kids to school, and taking on the responsibilities of home,

among countless other benefits."  Doc. 20 at 7.  This value, she claims, is reflected in

the divorce agreement.  She urges the Court to consider that she paid or assumed

liability for $28,000 in credit card debt the couple incurred, that she did not share in the

$30,000 Debtor received from his brother's estate or the $120,000 he received from his

aunt's estate and that she received no compensation for the work she performed for

Debtor's business.  She maintains that the history of their marriage and the sacrifices

she made during it should be considered in the Court's analysis.

While dissolution judgments are often given deference in a reasonably equivalent

value analysis under section 548(a)(1)(B), there appears to be no authority for the

proposition that the Court must or should give weight to historical transactions and the

parties' relationship rather than contemporaneous value given at the time of transfer in a

netting analysis under section 548(c).

Accordingly, the Court finds that the Trustee offered evidence sufficient to

establish a presumption of fraud under section 548(a)(1), but Defendant established

that she is a good faith transferee who gave value for the transfer under section 548(c).

Defendant may only retain the transfers to the extent she gave value, however.  Debtor

transferred $29,062.50 more to Defendant than the value she gave in exchange. The Trustee is, therefore, entitled to recover the difference.

## 2.   Constructive Fraud under 11 U.S.C. § 548(a)(1)(B)

In addition to alleging that Debtor transferred his interests in real estate to Defendant with actual intent to defraud creditors, the Trustee alleges a cause of action for constructive fraud under section 548(a)(1)(B). The Trustee may avoid transfers within the two-year period prior to the petition for bankruptcy relief by proving the following elements of constructive fraud under section 548(a)(1)(B) by a preponderance of the evidence:

> (1) an interest of the debtor in property; (2) was voluntarily or involuntarily transferred; (3) within [two years] of filing bankruptcy; (4) where the debtor received less than reasonably equivalent value; and (5) debtor was insolvent at the time of the transfer or became insolvent as a result thereof.

Sullivan v. Welsh (In re Lumbar), 457 B.R. 748, 753 (B.A.P. 8th Cir. 2011) (citing Schnittjer v. Houston (In re Houston), 385 B.R. 268, 272 (Bankr. N.D. Iowa 2008)).

The Trustee met his burden of proving the first three elements of his section 548(a)(1)(B) claim. Debtor voluntarily signed quit claim deeds transferring his interest in the marital home and pastureland on November 13, 2013. The deeds were recorded in November and December 2013. He petitioned for bankruptcy relief under Chapter 7 on October 28, 2014, less than one year after executing the quit claim deeds. Therefore, the Trustee satisfied these elements.

### a.   Debtor's Insolvency at the Time of Transfer

To succeed on the fourth element of his constructive fraud avoidance claim, the Trustee must prove that Debtor was insolvent at the time of the transfer. E.g., Killips v. Schropp (In re Prime Realty, Inc.), 376 B.R. 274, 278–279 (Bankr. D. Neb. 2007) (citing

Pummill v. McGivern (In re Am. Eagle Coatings Inc.), 353 B.R. 656, 665–66 (Bankr.

W.D. Mo. 2006)) (emphasizing the trustee's duty to prove insolvency "under the

statutory standard of fair valuation").  Section 101(32)(A) defines "Insolvent" as:

> [the] financial condition [of an entity] such that the sum of such entity's debts
> is greater than all of such entity's property, at a fair valuation, exclusive of—
> (i) property transferred, concealed, or removed with intent to hinder, delay,
> or defraud such entity's creditors; and (ii) property that may be exempted
> from property of the estate under Section 522 of this title.

11 U.S.C. § 101(32)(A).  In analyzing whether a debtor was insolvent, "the court should

examine the debtor's balance sheet to determine whether the value of its assets were

greater than its liabilities at the time of the transfer in question."  Killips v. Schropp (In re

Prime Realty, Inc.), 380 B.R. 529, 534 (B.A.P. 8th Cir. 2007) (citing Silverman

Consulting, Inc. v. Hitachi Power Tools, U.S.A., Ltd. (In re Payless Cashways, Inc.), 290

B.R. 689, 699 (W.D. Mo. 2003).

At the time of the divorce, Debtor owned an undivided one-half interest in the

pastureland, a joint interest in the marital home, a Ford F150, a Victory Motorcycle,

approximately $3,000 in the Gate City Bank account, guns, personal clothing,

belongings and effects.[19]  Debtor's only source of income at this time was social

security benefits totaling $1,100 per month.

At the time of the transfers, Debtor owed a joint debt on the Discover credit card

totaling between $4,600 and $6,000 and approximately $99,000 in debt secured by a

mortgage against the marital home—both of which Debtor transferred to Defendant in

---

[19]  It is possible Debtor owned trucking equipment at the time of the divorce
because Defendant thought this might be the case, but the Settlement Agreement did not
list this equipment.  Debtor testified that he thought the equipment had been sold before
the divorce.  Based on this testimony and the Settlement Agreement, the Court concludes
that Debtor's business assets had been liquidated before the divorce.

the divorce Settlement Agreement.  He also owed debt related to the purchase of his truck.  The Court received no evidence regarding Debtor's day-to-day living expenses, other than the fact that he lived with his girlfriend.

The Trustee offered evidence that Debtor <u>may have been</u> indebted to the IRS and two general unsecured creditors (whom he owed less than $1,000 each) on the date Debtor transferred his interest in the marital home and pastureland to Defendant.  The record shows that Debtor owed $8,023 in unsecured priority debt to the IRS on the date of petition, which he testified the IRS had forgiven.  It is unclear when the IRS debt arose, when Debtor and the IRS communicated about the debt or when the IRS forgave it.  Without more information and context, the Trustee has not met his burden of showing this debt is relevant to the insolvency analysis.

On the date he petitioned for bankruptcy relief, Debtor owed $76,679.40 to medical providers and a total of $84,517.40 to general unsecured creditors.  During his deposition, the Trustee asked Debtor if $84,517.40 was about the same amount as he owed at the time of the divorce.  Debtor's answer is not entirely responsive.  He stated that he called medical providers, who told him not to worry about his debt because the debt would be "taken care of."  Debtor did not agree or disagree that the entire sum of medical debt was due and owing at the time of his divorce or that he owed a total of $84,517.40 to unsecured creditors.  At trial, the Trustee reminded Debtor of his deposition testimony and asked Debtor if he owed debt to medical providers at the time of the divorce.  Consistent with his deposition testimony, Debtor testified at trial that he thought insurance benefits had satisfied or would satisfy his medical debts and denied transferring his interest in the pastureland and the house to avoid paying these debts.

In a confusing exchange with the Trustee at trial, Debtor conceded that he owed medical debt arising from his amputation at the time of the divorce, but repeated again that he did not expect to have to pay any of this debt. He did not think he would have any bills, except his car payment identified earlier in his testimony.

While it is apparent that most of the medical services provided to Debtor were delivered before he signed the Settlement Agreement on October 1, 2013, and the quit claim deeds on November 13, 2013, the Court received no invoices from medical service providers as evidence, and it is not clear whether Debtor had been billed for these services before October 2013, whether the insurance carrier had processed the bills or whether the debt was due and owing at the time of the divorce settlement. The only consistent evidence—which the Court finds credible—is Debtor's testimony that he thought insurance would cover all of his medical bills at the time he signed the divorce settlement. He also repeatedly testified that he had not used credit cards since 2009 and that he did not think he owed any debt except car payments when he signed the Settlement Agreement. Because it is not clear whether Debtor actually owed medical debt in excess of his ability to pay on the date of the transfers, the Court finds that the Trustee has not met his burden of proving, by a preponderance of the evidence, that Debtor was insolvent on the date he transferred his interest in real estate to Defendant.

b.    Reasonably Equivalent Value

To prevail on his constructive fraud theory of recovery, the Trustee must also show that Debtor did not transfer his interests in real estate for reasonably equivalent value. Meeks v. Don Howard Charitable Remainder Trust (In re S. Health Care of Ark., Inc.), 309 B.R. 314, 319 (B.A.P. 8th Cir. 2004). Whether a transfer is made for

40

reasonably equivalent value is a question of fact.  Id.  (citing Jacoway v. Anderson (In re Ozark Rest. Equip. Co.), 850 F.2d 342, 344 (8th Cir. 1988)).

Courts consider three factors in analyzing reasonably equivalent value: whether "(1) value was given; (2) it was given in exchange for the transfer; and (3) what was transferred was reasonably equivalent to what was received."  In re S. Health Care of Ark., Inc., 309 B.R. at 319 (citations omitted); In re Richards & Conover Steel, Co., 267 B.R. 602, 608 (B.A.P. 8th Cir. 2001) (citing Steffens v. Citicorp Mortgage, Inc., 148 B.R. 914, 916 (Bankr. W.D. Mo. 1993)).

The Bankruptcy Code defines "value" as "property in satisfaction or securing of a present or antecedent debt of the debtor, but does not include an unperformed promise to furnish support to the debtor or to a relative of the debtor." 11 U.S.C. § 548(d)(2)(A). "A transfer is in exchange for value if one is the quid pro quo of another."  In re Richards & Conover Steel, Co., 267 B.R. at 612; Kaler v. Able Debt Settlement, Inc. (In re Kendall), 440 B.R. 526, 532 (B.A.P. 8th Cir. 2010).

Here, the parties split their assets in a divorce settlement.  Among other property exchanged, Debtor transferred his interests in real estate and, in exchange for this transfer, received a release of liability from Defendant to pay credit card debt and the debt against the marital property.  The more difficult question is whether the real estate transfers the Trustee seeks to avoid were reasonably equivalent to debt transfers and other consideration in the divorce Settlement Agreement.

"There is no bright line rule used to determine when reasonably equivalent value is given."  In re Lindell, 334 B.R. at 255 (citation omitted).  Rather, courts consider the entire situation and base their analysis on the totality of circumstances.  Id.; Sullivan v.

Schultz (In re Schultz), 368 B.R. 832, 836 (Bankr. D. Minn. 2007) (citation omitted); In re

Ozark Rest. Equip. Co., 850 F.2d at 345.

The question of reasonably equivalent value is answered by determining

"whether the debtor received 'value that is substantially comparable to the worth of the

transferred property'"[20] or, phrased another way, whether the debtor "received a fair

exchange in the marketplace for the goods transferred."[21]  Courts also consider the

"important elements" of "(1) fair market value and (2) whether there was an arm's length

transaction."[22]  Schnoor v. Dailey (In re Schnoor) 510 B.R. 868, 874 (Bankr. D. Minn.

2014) (citations and internal quotation marks omitted).

A monetary payment is unquestionably "value."  In re S. Health Care of Ark., Inc.,

309 B.R. at 319.  Other benefits and burdens are considered "value" as well.  "'[T]he

requirement of economic benefit to the debtor does not demand consideration that

replaces the transferred property with something else tangible or leviable that can be

said to satisfy the creditor's claims.'"  In re Richards & Conover Steel Co., 267 B.R. at

612–13 (citing 2 Bankr. § 6–49 at p. 33 (David G. Epstein ed., 1992)).  When evaluating

whether a debtor received the reasonable equivalence of other consideration, a court

must examine the whole transaction and measure all the direct or indirect benefits and

burdens.  Id. at 612; In re S. Health Care of Ark., Inc., 309 B.R.at 319.  "If the measure

for reasonable equivalency is the value of an indirect benefit then that benefit must be

---

[20] Allred v. Parmley (In re Parmley), No. ADV 13-5005, 2013 WL 6577294, at *3
(Bankr. D.S.D. Dec. 16, 2013) (quoting BFP, 511 U.S. at 549–50).

[21] In re Ozark Rest. Equip. Co., 850 F.2d at 344–45; In re Richards & Conover
Steel, Co., 267 B.R. 602 at 612–13.

[22] "Fair market value is the benchmark for determining reasonably equivalent value
outside of foreclosure."  In re Lindell, 334 B.R. at 255 (citing BFP, 511 U.S. at 545).

tangible." In re S. Health Care of Ark., Inc., 309 B.R. at 319 (citation omitted). Indirect, non-economic, intangible, psychological benefits, such as a possible burden on a marital relationship or preservation of a family relationship, are not sufficient to constitute reasonably equivalent value. Dietz v. St. Edward's Catholic Church (In re Bargfrede), 117 F.3d 1078, 1080 (8th Cir. 1997) (citations omitted). Ultimately, a "determination of reasonably equivalent value is 'fundamentally one of common sense, measure[d] against market reality.'" In re Schnoor, 510 B.R. at 874 (citation omitted).

The reasonably equivalent value analysis is particularly challenging in this case because the Court is asked to evaluate transfers made pursuant to the Settlement Agreement incorporated into a state court divorce judgment. The majority of courts that reviewed asset transfers made in divorce proceedings under section 548 ruled that a state court dissolution judgment conclusively establishes "reasonably equivalent value" for purposes of section 548, even when the asset distribution appears unequal, but only when there is no evidence of actual fraud and the dissolution proceedings were regularly conducted, contested proceedings without any suggestion of collusion, sandbagging or any irregularity. See, e.g., Batlan v. Bledsoe (In re Bledsoe), 569 F.3d 1106, 1112 (9th Cir. 2009); Ingalls v. Erlewine (In re Erlewine), 349 F.3d 205, 212 (5th Cir. 2003).

While rejecting the applicability of res judicata, collateral estoppel and the Rooker-Feldman doctrine, the Fifth Circuit in In re Erlewine nevertheless concluded that "the federal full faith and credit statute requires us to give state court judgments the same preclusive effect that they would enjoy in the courts of the rendering state." In re Erlewine, 349 F.3d at 210. Like the Ninth Circuit in In re Bledsoe and many of the other

courts holding that a state court dissolution judgment conclusively establishes reasonably equivalent value under section 548, the In re Erlewine court relied on the principles articulated in BFP v. Resolution Trust Corp., 511 U.S. 531 (1994). Id. at 212.

In BFP, the Court held that a mortgage foreclosure sale price conclusively satisfies reasonably equivalent value so long as the sale was noncollusive and conducted in conformity with state law. BFP, 511 U.S. at 544–45. In its analysis, the Court noted: "Federal statues impinging upon important state interests 'cannot . . . be construed without regard to the implications of our dual system of government.'" Id. at 544 (citations omitted). The Court found that mortgage foreclosure law was an "essential state interest" that a federal statute may only displace if it is "clear and manifest." Id. (citations omitted). Citing these principles, courts affording conclusive effect to state court divorce judgments reason that regulating marriage is an essential state interest that Congress did not intend to displace with the "approximate term" of reasonably equivalent value. In re Bledsoe, 569 F.3d at 1112; see also In re Erlewine, 349 F.3d at 212–13. They also share the policy concern that failing to give conclusive effect to state court divorce judgments would "subject every divorce decree to scrutiny in the bankruptcy court, so long as the divorce court divided the community property unequally." Erlewine, 349 F.3d at 212; In re Bledsoe, 569 F.3d at 1112.

Courts that decline to grant divorce judgments conclusive effect focus on the differing standards employed by state courts in dividing marital property and bankruptcy courts in determining reasonable equivalence. See, e.g., Corzin v. Fordu (In re Fordu), 201 F.3d 693, 707–08 (6th Cir. 1999); In re Kimmell, 480 B.R. at 890; In re Neal, 461 B.R. at 438–39. These courts distinguish the Supreme Court's holding in BFP, noting

44

primarily that the "Supreme Court took pains to limit its decision to the real estate mortgage foreclosure context."  In re Fordu, 201 F.3d at 709, n.19.

The bankruptcy court in In re Sorlucco, adopted what appears to be a compromise between the approaches summarized above.  Harman v. Sorlucco (In re Sorlucco), 68 B.R. 748 (Bankr. D.N.H. 1986).  The In re Sorlucco court reasoned:

> In my judgment Congress by use of the language "reasonably equivalent value" has provided sufficient flexibility for reconciling the different public policy purposes between the state and federal laws. I believe that the bankruptcy standard in this context should be interpreted to require only a "surface determination" by the bankruptcy court that the division of marital property between the divorcing parties was within the range of likely distribution that would be ordered by the state divorce court if the property division had actually been litigated in that state court. In the present case I have no doubt that the distribution agreed upon by the debtor and Mrs. Sorlucco would have been within the range of such distribution in an actual litigated divorce proceeding.

> I realize that the approach I take here is not supported by any existing case law. However, the alternative is for the bankruptcy court in effect become a court of "de novo divorce jurisdiction" to reexamine and redetermine the balancing of various choate and inchoate marital rights and interests in property—to determine whether what the nondebtor spouse "gave up" was equal to what that spouse received as a result of the divorce decree. I cannot believe that Congress intended bankruptcy courts to have that overreaching, over-arching function with regard to the state courts in family law matters. . . .

> The appropriate inquiry, if a bankruptcy court were forced to undertake it, would be exactly equivalent to the function of the divorce court in making a sophisticated and refined analysis as to the history of the marriage, the circumstances of the parties, their individual future prospects, and all other factors impinging upon the marital rights of the parties consistent with the family law policies of the state involved. Such would be required before any meaningful determination of what the nondebtor spouse "gave up" in the divorce settlement could be made. It is for this reason that I find no escape from becoming a de novo divorce court if I do not take the "surface determination" approach described above.

> That approach does not leave the creditors of the bankrupt spouse unprotected from wrongful transfers. It must be shown that the property division was the result of arms-length bargaining in the light of the likely range of distribution that the divorce court might order if the matter went to

45

> a contested trial. Settlements reached in the shadow of an imminent
> bankruptcy filing would raise a clear factual question as to the bona fides of
> such bargaining. Moreover, as indicated above, the trustee under other
> provisions of § 548 can recover transfers occurring in any divorce
> proceeding on a showing of actual intent to hinder, delay or defraud without
> establishing a lack of reasonably equivalent value in the transfers. Transfers
> made on the eve of bankruptcy involving a deliberate attempt to delay or
> defraud creditors are separately attackable under that provision.

Id. at 753–55.  While this Court finds the approach adopted in In re Solucco and the

principles outlined in In re Bledsoe and In re Erlewine compelling, the Court need not

decide whether to give the divorce judgment in this case preclusive effect because the

divorce proceedings were not contested, only Defendant was represented by counsel,

and the Trustee alleged collusion, claiming there was direct evidence of fraud and

offering evidence sufficient to earn a presumption of fraud under section 548(a)(1)(A).

Nearly all courts that review dissolution judgments in the context of a section 548

analysis agree that the fact that a transfer occurs in the context of a divorce proceeding

does not immunize the transfer from a section 548 attack by the bankruptcy trustee.

E.g., Lovald v. Claussen (In re Claussen), 387 B.R. 249, 257 (Bankr. D.S.D. 2007)

(citations omitted); Goldstein v. Lange (In re Lange), 35 B.R. 579, 583 (Bankr. E.D. Mo.

1983); see also Gordon v. Love (In re Pullen), No. 09-61108-MGD, 2013 WL 5591919,

at *6 (Bankr. N.D. Ga. Aug. 7, 2013); Fogel v. Chevrie (In re Chevrie), No. 99 B 6542,

2001 WL 120132, at *10 (Bankr. N.D. Ill. Feb. 13, 2001) (collecting cases); Webster v.

Hope (In re Hope), 231 B.R. 403, 415 (Bankr. D.D.C. 1999) (collecting cases); In re

Solucco, 68 B.R. at 753.  These courts leave open the possibility that the Trustee may

avoid transfers made in compliance with dissolution judgments if he shows evidence of

actual fraud, collusion, sandbagging or any irregularity.

As already discussed, the Trustee did not meet his burden of proving direct fraud, but he offered evidence sufficient to show a presumption of fraud based on circumstantial evidence.  This evidence is sufficient to raise questions about unequal distribution of assets in this case, requiring the Court to consider the economic distribution without regard for non-economic, intangible, psychological benefits, such as a possible burden on a marital relationship or preservation of a family relationship.  See In re Bargfrede, 117 F.3d at 1080; Walker v. Treadwell (In re Treadwell), 699 F.2d 1050, 1051 (11th Cir. 1983) (holding that love and affection are not adequate consideration); Christians v. Crystal Evangelical Free Church (In re Young), 152 B.R. 939, 948 (D. Minn. 1993) (citation omitted) ("A debtor cannot receive reasonably equivalent value for payments that are made out of a sense of moral obligation rather than legal obligation") (citation omitted), rev'd on other grounds,141 F.3d 854 (8th Cir.1998); In re Whaley, 229 B.R. 767, 775 (Bankr. D. Minn. 1999) (citing In re Bargfrede, 117 F.3d at 1080) ("The easing of personal strain that had resulted from the existence of the debt, or the more general promotion of love, affection, or other personal tie, is too intangible for reasonable equivalence.").

In reviewing the quantifiable and economic value that Defendant gave in the divorce Settlement Agreement, the Court considered Defendant's request to give weight to the fact that she paid most, if not all, of the credit card debt totaling $28,000 when they separated in 2009.  She also argued that the Court should consider the fact that Debtor spent the $30,000 he inherited from his brother in 2007 and the $120,000 he inherited from his aunt in 2008 and she spent none of this money on personal expenses.  She also received none of the proceeds from the sale of the trucking assets,

reportedly sold shortly before the divorce. Debtor did not quantify the equity recouped from these sales, however. The cash Debtor received in 2007 and 2008, as well as Defendant's credit card debt payments, were not made contemporaneously with the real estate transfers in October 2013; therefore, the Court may not consider them in the reasonably equivalent value analysis. See Strauss v. Isaacks (In re Supinger), No. 08-50735, 2009 WL 3254462, at *5 (Bankr. W.D. Mo. Oct. 7, 2009) (finding that the transfer from the defendants to the debtor took place two years before the transfer from debtor to defendants and, therefore, did not constitute reasonably equivalent value under section 548(a)(1)(B) or value under section 548(c) because the transfers were not contemporaneous).

Viewing the Defendant's assumption of credit card debt and debt against the marital home in exchange for Debtor's real estate transfers from the perspective of Debtor, the numbers are the same as those outlined in the section 548(c) analysis. As explained in detail above, Debtor transferred more consideration than he received in the divorce proceedings. Accordingly, the Court finds that the Trustee met his burden of proving that Debtor did not receive reasonably equivalent value for real property interests he transferred.

In summary, the Court finds that the Trustee did not meet his burden of showing that Debtor was insolvent at the time of the transfers.[23] His cause of action under section 548(a)(2)(B) is dismissed.

---

[23] If the Trustee had met his burden on the element of insolvency, he would have established both elements of his section 548(a)(2)(B) analysis, requiring the Court to analyze Defendant's affirmative defense under section 548(c). See In re Petters Co., 499 B.R. at 359 (citations omitted) ("[Section 548(c)] applies to both varieties of fraudulent transfer claim."); Gowan v. Patriot Grp., LLC (In re Dreier LLP), 452 B.R. 391, 426 (Bankr.

## B.    Preferential Transfer under 11 U.S.C. § 547(b)

To avoid Debtor's transfer of his real estate interests to Defendant as preferential under section 547(b), the Trustee must show that the transfers were (1) made to or for a creditor's benefit, (2) for a debt preexisting the transfer, (3) while Debtor was insolvent, (4) made within 90 days of the petition or within one year of the petition, if Defendant was an "insider."  11 U.S.C. § 547(b)(1)-(4).  The Trustee must also show that Debtor transferred more to Defendant than she would have received in a hypothetical liquidation bankruptcy proceeding.  See 11 U.S.C. § 547(b)(5).  The Trustee bears the burden of proving each of these elements by a preponderance of the evidence. Stingley v. AlliedSignal, Inc. (In re Libby Int'l, Inc.), 247 B.R. 463, 466 (B.A.P. 8th Cir. 2000) (citations omitted).  The burden then shifts to the transferee to prove any affirmative defenses pursuant to section 547(c).  Id.

Defendant argues that she is not a "creditor" of Debtor under the Bankruptcy Code and, therefore, the Trustee cannot establish all the elements of his preference claim.  The Bankruptcy Code defines a "creditor" as any "entity that has a claim against the debtor that arose at the time of or before the order for relief concerning the Debtor." 11 U.S.C. § 101(10)(A).  It defines a "claim" as a "right to payment" or "right to an equitable remedy for breach of performance" and a "debt" as a "liability on a claim."  11

---

S.D.N.Y. 2011) (citing Nisselson v. Empyrian Inv., Fund, L.P. (In re MarketXT Holdings Corp.), 426 B.R. 467, 476 (Bankr. S.D.N.Y. 2010) ("Section 548(c) provides a defense to both actual and constructive fraudulent conveyance claims under the Bankruptcy Code."). As discussed in detail above, Defendant established that she is a good faith transferee who gave value for the transfer under section 548(a).  However, she may only retain the transfers to the extent she gave value.  Here, Debtor transferred $29,062.50 more to Defendant than the value she gave in exchange.  Therefore, the Trustee would be entitled to recover the difference.

U.S.C. § 101(5)(A)-(B), (12).  Debtor and Defendant entered into a divorce Settlement Agreement that the district court incorporated in its Order for Judgment and Judgment. The Judgment, which was legally enforceable, required Debtor to transfer his interest in the marital home and pastureland to Defendant.  The Settlement Agreement and Judgment rendered Defendant a creditor of Debtor at the time of the transfers.  E.g., Terry v. Paschall (In re Paschall), 403 B.R. 366, 375 (Bankr. E.D. Va. 2009) aff'd sub nom. Prunty v. Terry, 388 F. App'x 299 (4th Cir. 2010); Hunter v. Dupuis (In re Dupuis), 265 B.R. 878, 883–84 (Bankr. N.D. Ohio 2001).  Consequently, Defendant's argument is rejected.

Defendant's claim against Debtor arose when Debtor signed the Settlement Agreement on October 1, 2013.  Pursuant to the Settlement Agreement and Judgment, Debtor transferred his interests in real estate by quit claim deeds recorded on November 22, 2013, and December 16, 2013.  Thus, Defendant's claim arose before Debtor transferred the property.  Therefore, the Trustee established the first two elements of his section 547(b) cause of action.

Defendant also received more from the transfer than she would have received in a hypothetical liquidation proceeding.  In analyzing what creditors would receive in a Chapter 7 liquidation, Eighth Circuit courts look at the value of the collateral and debt at the time of petition, rather than at the time of the transfer.  Falcon Creditor Trust v. Falcon Ins. Funding (In re Falcon Prods., Inc.), 381 B.R. 543, 546 (B.A.P. 8th Cir. 2008).  It is "generally well settled that unless creditors would receive a 100% payout, any unsecured creditor who receives a payment during the preference period is in a position to receive more than it would have received under a Chapter 7 liquidation."

Hoffinger Indus., Inc. v. Bunch (In re Hoffinger Indus., Inc.), 313 B.R. 812, 827 (Bankr. E.D. Ark. 2004) (citations and internal quotation marks omitted); Velde v. Reinhardt, 366 B.R. 894, 898 (D. Minn. 2007) (citations omitted) aff'd, 294 F. App'x 242 (8th Cir. 2008); accord Still v. Rossville Bank (In re Chattanooga Wholesale Antiques, Inc.), 930 F.2d 458, 465 (6th Cir. 1991).

In this case, Debtor's creditors will not receive a 100 percent payout. The schedules show that Debtor's debts far exceed his assets. The real estate interests that Debtor transferred to Defendant comprise the bulk of his assets and are the only nonexempt assets of significant value. Moreover, Defendant's claim is unsecured and is not a priority claim. Therefore, Defendant received more from the transfers than she would have received in a Chapter 7 liquidation. The Trustee established this element of his section 547(b) claim. See 11 U.S.C. § 547(b).

The Trustee must also establish that Debtor transferred the real estate interests within 90 days of the petition or within one year of the petition, if Defendant was an "insider." 11 U.S.C. § 547(b)(1)-(4). Debtor signed the quit claim deeds transferring his interest in the marital home and pastureland on November 13, 2013. He delivered the deeds to Defendant's attorney the same day. The deeds were recorded on November 22, 2013 and December 16, 2013, within one year of Debtor's bankruptcy petition but more than 90 days before the petition. Consequently, the Trustee must show that Defendant was an "insider" to succeed in avoiding the transfer as preferential under section 547(b).

"Insider" is a flexible term under bankruptcy law: rather than defining it, the Bankruptcy Code provides a nonexclusive list of examples. 11 U.S.C. § 101(31). The

list of insiders includes "relatives" of the debtor, meaning any individual related by marriage or blood within the third degree.  11 U.S.C. § 101(31)(A)(i) and (45).[24]  Former spouses are not "relatives" under this definition because they are no longer related by affinity.[25]  E.g., Goldstein v. Lange (In re Lange), 35 B.R. 579, 582 n.3 (Bankr. E.D. Mo. 1983) (citation omitted); see also In re Paschall, 403 B.R. at 377; West v. Christensen (In re Christensen), No. ADV 13-2248, 2014 WL 1873401, at *9 (Bankr. D. Utah May 8, 2014); Harpley v. Kostakis (In re Reilly), No. 05-21668-PMG, 2007 WL 4731020, at *3 (Bankr. M.D. Fla. Mar. 27, 2007).  The divorce judgment was entered on October 10, 2013.  Debtor executed the quit claim deeds 43 days later, and they were recorded on November 22 and December 16, 2013.  Defendant and Debtor were not related by affinity at the time of the transfer.  Consequently, Defendant does not fall within the list of statutory insiders.

The list of insiders provided in section 101(31) is not exclusive, however.  11 U.S.C. § 102(3) ("'[I]ncludes' and 'including' are not limiting.").  Courts have also defined insiders as those who have "a sufficiently close relationship to the debtor that its conduct is made subject to closer scrutiny than those dealing at arm's length with the debtor."  See, e.g., Carlson v. Farmers Home Admin. (In re Newcomb), 744 F.2d 621, 624 n.4 (8th Cir. 1984) (citing S. Rep. No. 95-989, 95th Cong., 2d Sess., reprinted in

---

[24] A "relative" is any "individual related by affinity or consanguinity within the third degree as determined by the common law."  11 U.S.C. § 101(45).

[25] According to House and Senate reports, "a former spouse is not a relative, but if, [for purposes of section 547], the transferee was a spouse of the debtor at the time of the transfer sought to be avoided, then the transferee would be [a] relative and subject to the insider rules."  H.R. Rep. No. 95–595, at 313 (1977), reprinted in 1978 U.S.C.C.A.N. 5963, 6270; S. Rep. No. 95–989, at 26 (1978), reprinted in 1978 U.S.C.C.A.N. 5787, 5811.

1978 U.S.C.C.A.N. 5787, 5810); In re Rosen Auto Leasing, Inc., 346 B.R. at 804

(citations omitted); Eide v. Nat'l City Capital Corp. (In re Riversideworld, Inc.), 366 B.R.

34, 43 (Bankr. N.D. Iowa 2007) (citation omitted).  The extent to which the defendant

was in a position to control or influence the debtor is a relevant inquiry in this analysis.

In re Riversideworld, Inc., 366 B.R. at 43; Meeks v. Rison (In re Armstrong), 231 B.R.

746, 749 (Bankr. E.D. Ark. 1999) (citations omitted).

The "closeness of the relationship between the parties" is also relevant to

whether the creditor is an insider.  In re Rosen Auto Leasing, Inc., 346 B.R. at 804.  This

consideration is particularly relevant when a trustee alleges that a former spouse is an

insider.  Hunter v. Dupuis (In re Dupuis), 265 B.R. 878, 885 (Bankr. N.D. Ohio 2001);

Browning Interests v. Allison (In re Holloway), 955 F.2d 1008, 1012 (5th Cir. 1992).  In

In re Dupuis, the bankruptcy court considered the following factors in determining

whether the facts show sufficient "closeness" to render the former spouse an insider of

the debtor:

> The length of the parties' marriage; the length of time between the
> termination of the marriage and the preferential transfer; whether the
> parties, after the termination of their marriage, maintain any sort of business
> relationship together; the extent to which the parties' divorce was
> adversarial in nature; whether the parties continued to live together and/or
> share living expenses; the time between the parties' physical separation
> and divorce; the extent to which the parties' marital assets and liabilities
> continue to be intertwined.

In re Dupuis, 265 B.R. at 885.  A former spouse may also be a non-statutory insider

where the former spouse is in a position to exercise some degree of control or influence

over the debtor.  E.g., Salkin v. Chira (In re Chira), 353 B.R. 693, 725 (Bankr. S.D. Fla.

2006); In re Dupuis, 265 B.R. at 885.

In this case, Debtor and Defendant were married 28 years and had five children. They separated approximately four years before Debtor signed the Settlement Agreement in October 2013. They never lived together after their separation. During their separation, Debtor and Defendant maintained limited contact to facilitate Debtor's visits with his children. Although their communication was typically cordial rather than contentious, it was not regular. They only talked once or twice a month, usually about the children.

Debtor and Defendant continued to file joint tax returns after their separation and Defendant did not take steps to remove him from her health insurance policy. Other than these decisions, they lived separate lives. Defendant and Debtor no longer supported each other financially after they separated. Defendant stopped managing Debtor's personal and business finances after they separated, forcing him to assume those responsibilities even though she claimed he was not capable of managing his finances without assistance. The couple divided most of their assets after the separation. Defendant assumed possession of the marital home and continued to make payments toward the debt against it, and she also assumed responsibility for paying their credit card debt. Debtor kept his personal bank account and trucking business assets. Except for their co-ownership in the marital home and related debt obligations, their assets were not intertwined after the separation.

Based on the evidence received at trial, the Court is not convinced that Defendant exerted control or influence over Debtor. Instead, the Court finds that the parties negotiated an arm's length divorce agreement, even though only Defendant was represented by counsel. Debtor credibly explained his decision to transfer his property

54

interests to Defendant, a decision that was informed and justified from his perspective.

Debtor maintains that his decision to transfer his interests in the marital home and

pastureland was based on the history of their relationship and Debtor's desire to be fair

to Defendant.  Defendant was the primary caregiver for their children.  She managed

the household with very little assistance from Debtor.  She also managed his business

finances until they separated for no consideration.  She assumed responsibility to pay

the debt against their home, even though much of this debt arose from Debtor's

business expenses.  When he inherited large sums of money, Defendant spent none of

it on personal expenses.  Debtor admits that he spent most of his inheritance on stock

market investments and socializing.  Based on the record, Defendant had little influence

or control over Debtor's decisions, especially after they separated.

Debtor also testified that he transferred the land to Defendant, hoping she would

ultimately "do the right thing" and transfer it to their children.  Debtor considered the

house Defendant's because she was the mother in the family.  The evidence also

shows that she made all the payments on the marital home, lived there and maintained

it.  While Debtor's transfer of his interest in the pastureland raises questions regarding

Debtor's intent in the context of the Trustee's fraudulent transfer claim under section

548, Debtor's and Defendant's testimony are both compelling and credible evidence

supporting Defendant's assertion that she is not an "insider" under section 547.  They

both testified that the Settlement Agreement and resulting Judgment were fair and

equitable considering the history of their relationship.  At the time they negotiated the

divorce settlement, both assumed her health insurance policy would cover the cost of

Debtor's medical expenses; neither anticipated he would owe over $70,000 in medical

debt.  Their intent was to divide the assets equitably.  Their divorce was not a sham.

Accordingly, the Court is satisfied that Defendant was not an "insider" at the time Debtor

transferred his property interests to Defendant.  See, e.g., Miller v. Schuman (In re

Schuman), 81 B.R. 583, 587 (B.A.P. 9th Cir. 1987) (finding no insider status even

though the debtor expressed a desire to provide for his children as part of a transfer to

his former spouse).  The Trustee did not meet his burden of showing that the transfers

were made within 90 days of the petition.  He may not take advantage of the longer

limitations period because he did not show that Defendant was an "insider" under

section 547(b)(4).

Moreover, as discussed above, the Trustee did not meet his burden of proving

that Debtor was insolvent at the time he transferred his interests in the marital home

and pastureland.[26]  Therefore, the Trustee's section 547(b) preference action fails for

this reason as well.

The Court considered all other arguments and deems them to be without merit.

## IV.    CONCLUSION

For the reasons stated above, it is **ORDERED** that:

1.    Trustee offered evidence sufficient to establish a presumption of fraud under

section 548(a)(1)(A), but Defendant established that she is a good faith

transferee who gave value for the transfer under section 548(c).  However,

---

[26] The Bankruptcy Code's presumption of insolvency under section 547 only
applies to transfers occurring on or within 90 days of the debtor's bankruptcy petition.  11
U.S.C. § 547(f).  Thus, the Trustee must prove Debtor's insolvency at the time of the
transfer under the balance sheet test.  See, e.g., Sarachek v. Right Place Inc. (In re
Agriprocessors, Inc.), No. 08-2751, 2011 Bankr. Lexis 3671, at *18 (Bankr. N.D. Iowa
2011).

she may only retain the transfers to the extent she gave value.  Here, Debtor

transferred $29,062.50 more to Defendant than the value she gave in

exchange.  The Trustee is, therefore, entitled to recover the difference.

Judgment may be entered against Defendant and in favor of the Trustee in

the sum of $29,062.50.

2.   The Trustee's claim and cause of action under 11 U.S.C. § 548(a)(1)(B) is

**DISMISSED with prejudice**.

3.  The Trustee's claim and cause of action under 11 U.S.C. § 547 is

**DISMISSED with prejudice**.

Judgment may be entered accordingly.

Dated:  April 19, 2016.

_____/s/ SHON HASTINGS_____
SHON HASTINGS, JUDGE
UNITED STATES BANKRUPTCY COURT